**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **RAYMOND SMITH,** *on behalf of the Estate of deceased Rainer Smith, on behalf of Rainer Smith, Jr.;* **and AMY RYLES,**[1] *on behalf of Abigail Smith;*<br><br>    *Plaintiffs,*<br><br>**v.**<br><br>**JOHN FORD,** *et al.,*<br><br>    *Defendants.* | **CIVIL ACTION NO.**<br>**5:19-cv-00312-TES** |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At 2:00 on a Monday morning, the Peach County SWAT Team raided the home of suspected marijuana dealer Rainer Smith. A gunfight ensued, Smith shot two SWAT Team Members, and the SWAT team killed Smith. Plaintiffs filed suit under 42 U.S.C. § 1983 claiming violations of the Fourth Amendment and various state-law causes of action. The Defendants move for summary judgment on the grounds that qualified and official immunity shield the five SWAT Team officers from liability and because Plaintiffs failed to offer any evidence that they complied with Georgia's *ante litem* notice statute.

---

[1] "Amy Ryles was the fiancée of Rainer Smith and the mother of Abigail Smith (child of now deceased Rainer Smith)." [Doc. 1-2 at ¶ 3].

## BACKGROUND

A.    **Factual Background**

In May and December 2016, confidential informants told Ashley Greer[2] ("Greer")

that Smith was growing and selling marijuana from his residence at 6750 Georgia

Highway 42 in Crawford County.[3] [Doc. 14-2, ¶¶ 2, 3]; [Doc. 15-1, ¶¶ 2, 3]. A December

2016 trash pull at Smith's home revealed a small quantity of marijuana and some

"marijuana packaging material." [Doc. 14-2, ¶ 4]; [Doc. 15-1, ¶ 4]. Greer prepared an

affidavit and application for a search warrant and presented it to a Crawford County

Magistrate Judge on December 9, 2016. [Doc. 14-11, ¶¶ 6, 7]. The affidavit stated that

there was "marijuana, plastic bags commonly used for the packaging of marijuana, and

digital scales" at the premises being possessed in violation of Georgia law. [*Id.* at p. 9].

The affidavit also contained boilerplate language that "[s]ince this target location is an

establishment for drugs and drug transactions, there may be 'other individuals' who

may be occupying this location at the time of the execution of the warrant which they

may have in their possession, drugs and/or weapons." [*Id.* at p. 10]. The Magistrate

---

[2] At all times relevant to this lawsuit, the City of Byron Police Department employed Ashley Greer as a law enforcement officer and assigned him to the Peach County Drug Enforcement Unit. [Doc. 14-11, ¶ 2]. Plaintiffs did not name Greer as a defendant in this lawsuit.

[3] Smith lived in Crawford County. A Crawford County Magistrate Judge issued the search warrant, but the Crawford County Sheriff asked the Peach County SWAT Team to assist in the execution of this search warrant. The Peach County sheriff had deputized all members of the Peach County SWAT Team, even those employed by entities other than Peach County. [Doc. 14-2, ¶¶ 7, 8]; [Doc. 17, Lavender Depo., p. 38:7–22].

Judge signed the warrant on December 9. [*Id*. at p. 14].

On December 10, Greer contacted Bill Lavender ("Lavender"), Captain of the Byron Police Department and Commander of the Peach County SWAT Team, about the need to assemble a team to execute the search warrant on Smith's home. [Doc. 14-2, ¶¶ 8, 9]. Lavender agreed to help, and on December 11, Lavender contacted SWAT Team members James Wynn ("Wynn"), John Ford ("Ford"), Steve Farmer ("Farmer"), and William Patterson ("Patterson"), to confirm their availability to help execute the search warrant.[4] [*Id*. at ¶ 10]. The team met at the Byron Police Department at approximately 1:15 a.m. on December 12. Greer showed the SWAT Team members a copy of the search warrant, photos of the exterior of Smith's house, and told them that he had reason to believe Smith was growing and selling marijuana. [*Id*. at ¶ 13]. Lavender instructed the SWAT Team that they would go into the house in the following order: Ford, Wynn, Farmer, Patterson, with Lavender serving as rear guard. [*Id*. at ¶ 14].

The men loaded up into two unmarked Ford F-150 pickup trucks. [Doc. 17, Lavender Depo., pp. 34:7–35:9]. The first truck contained Greer, narcotics officer Vet Miller ("Miller"), and criminal investigator John Edwards ("Edwards"). [*Id*.]. Lavender drove the second truck containing the SWAT Team. [*Id*.]. When they arrived at the Smith property, Edwards and Miller hopped out of the first truck and used bolt cutters

---

[4] Lavender, Wynn, Ford, Farmer, and Patterson are the five named individual Defendants and are referred to collectively as the "SWAT Team."

to cut the locked gate. [*Id*.]. The trucks proceeded up the driveway with their headlights on.

Amy Ryles ("Ryles") woke up in the middle of the night to feed and change her baby, Abigail. [Doc. 14-4, Ryles Depo., p. 25:17–21]. Ryles then placed Abigail in the "big bed" with her fiancé (Abigail's father), Rainer Smith. [*Id*. at p. 26:22]. Ryles then found herself, as people tend to do late at night, standing in her kitchen at the refrigerator considering the possibility of a late-night snack. [*Id*. at p. 26:21–25]. She momentarily diverted her attention from the refrigerator to two Ford F-150 pickup trucks that were making their way up the driveway. [*Id*. at p. 29:12]. At that moment she yelled to Smith, "two trucks just busted in the driveway!" [*Id*. at p. 31:15–16]. Ryles ran back to the bedroom where a naked Smith jumped to his feet and threw on his "sleep pants." [*Id*. at p. 31:17–19]. Smith grabbed the shotgun that was next to the bed, told Ryles to stay in the bedroom with the baby, and exited the bedroom. [*Id*. at p. 31:19–21]. Ryles and Abigail would never see Smith alive again.

Upon arrival, the five members of the SWAT Team planned to enter through the front door of Smith's home. However, they soon realized that a washing machine blocked the front door. [Doc. 14-4, ¶ 17]. Greer decided they would enter through the back door instead. [*Id*.].

The officers say that they knocked on the back door and yelled "sheriff's office, search warrant!" [*Id*. at ¶ 18]. No noise or signs of movement came from within the

house. [*Id*.]. "Anywhere between 5, 10, [or] 15 seconds" later, Wynn used a ram to breach the door. [*Id*. at ¶ 20]; [Doc. 18, Wynn Depo., p. 30:23]. With the door open, but before entering the house, the officers say that Ford again yelled loudly, "sheriff's office, search warrant!" [*Id*.].

The SWAT Team proceeded into the house with Ford leading the way. [*Id*. at ¶ 21]. Ford heard a shotgun blast and yelled "shots fired! shots fired!" [Doc. 19, Ford Depo., p. 73:19—22]. Ford turned a corner and saw Smith with a shotgun in his hand. [*Id*. at pp. 73:25—74:4]. Ford directed Smith to "drop it." [*Id*. at p. 74:5]. Smith fired the shotgun again and Ford took cover. [*Id*. at p. 74:6–13]. Ford then emerged from his cover and fired multiple rounds at Smith with his AR-15-style rifle. [*Id*. at p. 74:14–18]. One of Smith's shots hit Wynn in the arm, and Wynn returned fire from his Glock pistol. [Doc. 14-2, ¶ 28]. Farmer also fired several shots at Smith. [*Id*. at ¶ 29]. Smith also hit Patterson with one of his shots. [*Id*. at ¶ 31]. Ford, sure that some of his shots had hit Smith, saw that Smith was down and not moving. [Doc. 19, Ford Depo., p. 75:3–6].

The only other witness, Ryles, tells a much different story. From her position in the bedroom with Abigail, Ryles heard nothing until gunshots. [Doc. 14-4, Ryles Depo., p. 31:23]. To the best of Ryles' recollection, only about 30 to 60 seconds elapsed from the time Smith left the room to the time the gunfire ended. [*Id*. at p. 33:13–15]. When the gunfire ceased, she could hear people talking. [*Id*. at p. 34:18–20]. She then stuck her head out of the bedroom door and saw Ford in the hallway. [*Id*. at pp. 34:25—35:1].

Ford told her to "get the fuck on the ground and shut the fuck up." [*Id*. at p. 35:2–3].

Shortly thereafter, Greer entered the room and let Ryles tend to Abigail. [*Id*. at p. 35:4–4].

B.    **Procedural History**

Plaintiffs filed a Complaint [Doc. 1-2] on July 5, 2019,[5] in the Superior Court of Peach County. Defendants answered [Doc. 1-10] and removed the case to this Court on August 5, 2019. [Doc. 1, pp. 1–5]. That same day, Defendants also filed a motion to dismiss. [Doc. 2]. Plaintiffs never responded to Defendants' motion to dismiss. The Court granted Defendants' motion as to Plaintiffs' conspiracy claims, § 1983 claim against the City of Byron, § 1983 claims against Defendants Ford, Wynn, Farmer, Patterson, and Lavender in their official capacities, and punitive damages claims against the City and the other Defendants in their official capacities. [Doc. 5]. Accordingly, Plaintiffs' state-law wrongful death and negligence claims against the City

---

[5] Georgia law provides that the statute of limitations in a wrongful death suit (and thus, a § 1983 claim) is two years. O.C.G.A. § 9-3-33. Plaintiffs clearly filed this lawsuit more than two years after the date of the incident. The Plaintiff's Complaint states that "any statute of limitations has been tolled, as the investigation of Defendants did not terminate until 2018, and the decedent had not opened an estate in probate, and the other two Plaintiffs are minors." [Doc. 1-2, ¶ 10]. Although Defendants included a statute of limitations defense in their Answer [Doc. 1-10, p. 3], they did not raise the defense in their Motion to Dismiss or in their Motion for Summary Judgment. In any case, the Court recognizes that O.C.G.A. § 9-3-99 tolls the applicable statute of limitations until any criminal investigation or prosecution has become final or otherwise terminated. *See Winston v. Walsh*, No. 5:19-cv-00070-TES, 2020 WL 1493659, at *2 (M.D.Ga. March 27, 2020). The record contains ample reference to a Georgia Bureau of Investigation ("GBI") investigation regarding the officers involved in the shooting that was completed sometime in 2018. Presumably, this investigation tolled the statute of limitations until the completion of the investigation in 2018. While the Defendants have not raised the issue, the Court remains satisfied there is not a statute of limitations question in this case.

of Byron and the officers, as well as the § 1983 claims against the officers in their

individual capacities, survived.

On August 3, 2020, Defendants filed a Motion for Summary Judgment. [Doc. 14-

3]. Defendants argue that Plaintiffs' remaining claims are barred by qualified immunity,

official immunity, and Plaintiffs' failure to adhere to Georgia's *ante litem* notice statute.

[*Id*.]. Plaintiffs respond by arguing that Defendants are not protected by qualified

immunity because they were acting outside of their discretionary authority, and

because Defendants violated Plaintiffs' clearly-established constitutional rights. [Doc.

15, pp. 4–9]. Plaintiffs also argue that Defendants acted with actual malice and are thus

not shielded by official immunity as to the state law claims. [*Id*. at pp. 10–11].

## DISCUSSION

### A.      Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence would allow a

reasonable jury to return a verdict for the nonmovant and a fact is material if it "might

affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In

considering this motion, "the evidence of the [nonmovant] is to be believed, and all

justifiable inferences are to be drawn in [the nonmovant's] favor." *Id*. at 255. However,

the Court need not draw "all possible inferences" in favor of the nonmovant. *Horn v.*

*United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011).

The movant "bears the initial burden of informing the district court of the basis for its motion[] and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant "to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Jones*, 683 F.3d at 1292 (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2012)).

The Court finds the recent Eleventh Circuit summary judgment analysis in *Sconiers v. Lockhart* highly instructive in this case:

> Summary judgment is not a time for fact-finding; that task is reserved for trial. *See, e.g., Tolan v. Cotton*, 572 U.S. 650, 655–57, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014). Rather, on summary judgment, the district court must accept as fact all allegations the non-moving party makes, provided they are sufficiently supported by evidence of record. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). So when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir. 1996).

946 F.3d 1256, 1263 (11th Cir. 2020).

**B.**   **1983 Claims**

Plaintiffs bring claims under 42 U.S.C. § 1983 against the five SWAT Team officers in their individual capacities for "unlawfully entering on to [Smith's] property," "failing to announce themselves as police officers while allegedly executing a warrant," "entering the home without announcing themselves," and "shooting [Smith] to death." [Doc. 14-1, p. 2]. The Court interprets Plaintiffs' § 1983 claims about unlawful entry and failure to announce to be one in the same: was the entry (including the manner of entry) lawful? The Court finds Plaintiffs' § 1983 claim about shooting Smith to be an excessive force claim. The SWAT Team officers move for summary judgment on both the unlawful entry and excessive force claim on the grounds that they are protected by qualified immunity. [Doc. 14-3, pp. 5–13].

Qualified immunity protects government officials if two requirements are met. First, the government official must be acting within the scope of their discretionary authority. *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). If the government official is acting within his or her discretionary authority, the burden shifts to the plaintiff to establish that the government official violated a clearly established constitutional right. *See Santana v. Miami-Dade Cnty*, 688 F. App'x 763, 767–68 (11th Cir. 2017) (citing *Dalrymple v. Reno*, 334 F.3d 991, 995 (11th Cir. 2003)). The Court examines each claim in turn. *See id*. at 768.

1.    <u>Unlawful Entry</u>

Plaintiffs claim that the five members of the SWAT Team violated the Fourth

Amendment by unlawfully entering Smith's home. The parties hotly dispute whether

the Defendants knocked and announced upon entering Smith's home. The five SWAT

Team members state in their affidavits that they knocked and announced before

ramming the door open, and announced again after ramming the door open—but

before entering the home. [Doc. 14-2, ¶¶ 18, 20]. But, Amy Ryles denies this. She

testified that she was in the house and she did not hear any knocking or announcing at

all. [Doc. 14-4, Ryles Depo., p. 69:6–16]; [Doc. 15-1, ¶¶ 18, 20]. Specifically, Ryles states

that she heard no noise from the SWAT Team until she heard gunshots, and that she

heard men speaking after the gunshots, and if the officers had been announcing their

presence like they claim they were, she would have heard it. [*Id*.]. Thus, for the

purposes of the Defendants' Motion for Summary Judgment, the Court accepts

Plaintiffs' version of the facts as they are the nonmoving party and assumes that the

officers did not knock or announce prior to entering Smith's home. *See Anderson*, 477

U.S. at 251 (the district court must accept as fact all allegations the non-moving party

makes, provided they are sufficiently supported by evidence in the record); *McCullough*

*v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (when considering qualified immunity at

summary judgment, the facts accepted as true may not be the actual facts of the case).

The Court's analysis of whether qualified immunity shields the Defendants from

Plaintiffs' unlawful entry claim focuses on three primary questions:

(1) were the Defendants acting within their discretionary authority?

(2) did the Defendants' entry violate the Fourth Amendment? and

(3) was this constitutional right clearly established?

> i.      *Discretionary Authority*

Plaintiffs argue that Defendants were acting outside of their discretionary authority by not knocking and announcing while executing a warrant that did not authorize that manner of entry. [Doc. 15, pp. 4–5]. However, in *Santana*, the Eleventh Circuit found that an officer who did not knock or announce while executing a standard search warrant acted within the scope of his discretionary authority. 688 F. App'x at 767. ("[Defendant] was assisting in the execution of a search warrant, and thus engaged in a discretionary duty, when he entered [Plaintiff's] residence."). The Court easily answers the first question "yes" because when the Defendants entered Smith's home pursuant to the search warrant, they necessarily acted within their discretionary authority.

> ii.      *Constitutional Violation*

Under most circumstances, the Fourth Amendment requires officers to "knock and announce" before forcibly entering a home to execute a search warrant. *Id*. at 768 (citing *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995)). However, officers can enter without knocking and announcing if they have "reasonable suspicion that knocking and

announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). The relevant inquiry is "whether the officer had 'arguable reasonable suspicion' that a sufficient exigency existed to justify a no-knock entry." *Santana*, 688 F. App'x at 768 (quoting *Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009)). Courts are to "analyze whether a reasonable officer could have had reasonable suspicion that exigent circumstances, such as a threat of violence and/or destruction of evidence, existed to justify a no-knock entry." *Kobayashi*, 581 F.3d at 1308. "[The] Court must examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion." *Whittier v. Bruna*, 343 F. App'x 505, 508 (11th Cir. 2009) (quoting *Brent v. Ashley*, 247 F.3d 1294, 1304 (11th Cir. 2001)). Notably, the required showing on this point is "not high." *Richards*, 520 U.S. at 394.

First, whether a no-knock entry violates the Fourth Amendment does not turn on whether the search warrant itself authorizes a no-knock entry. What matters is whether the officers executing the search warrant had arguable reasonable suspicion of a sufficient exigency. *Richards*, 520 U.S. at 396 n.7 ("[A] magistrate's decision not to authorize a no-knock entry should not be interpreted to remove the officers' authority to exercise independent judgment concerning the wisdom of a no-knock entry at the time the warrant is being executed."). And to be clear, the search warrant issued here

did not authorize a no-knock entry. [Doc. 14-11, pp. 13–14]; [Doc. 14-2, ¶ 13 ("Greer made it crystal clear at the briefing that this was a 'knock and announce' warrant.")].

As mentioned above, the Court assumes that the officers did not knock and announce before they entered the home. The Court must now inquire into whether the officers had any arguable reasonable suspicion of exigent circumstances that would justify a no-knock entry. The Court must look to "whether the facts and circumstances of [this] particular entry justified dispensing with the knock-and-announce requirement." *Richards*, 520 U.S. at 394. Doing so, the Court concludes that the officers lacked the required reasonable suspicion of exigent circumstances to justify a no-knock entry.

The officers certainly had reasonable suspicion that drugs were inside the home. It is undisputed that in May 2016 a confidential informant told Ashley Greer that Rainer Smith grew and sold marijuana at his residence. [Doc. 14-2, ¶ 2]; [Doc. 15-1, ¶ 2]. It is undisputed that six months later (December 2016), a confidential informant[6] again told Ashley Greer that Rainer Smith sold marijuana from his residence. [Doc. 14-2, ¶ 3]; [Doc. 15-1, ¶ 3]. The parties do not dispute that a trash pull conducted in December 2016 revealed a small quantity of marijuana. [Doc. 14-2, ¶ 4]; [Doc. 15-1, ¶ 4]. The Plaintiffs don't dispute that on December 12, 2016, Ashley Greer briefed all the officers who participated in the execution of the search warrant and advised them that he

---

[6] The record does not say whether both reports to Greer involved the same informant.

believed Mr. Smith was growing marijuana at the target property. [Doc. 14-2, ¶ 13]; [Doc. 15-1, ¶ 13]. Accordingly, all five of the SWAT Team officers reasonably suspected that Smith was involved in marijuana-related activities.

But reasonable suspicion of drugs and/or drug dealing inside of a home, with nothing else, does not justify a no-knock entry. The Supreme Court has clearly and flatly "reject[ed] the blanket exception to the knock-and-announce requirement for felony drug investigations." *Richards*, 520 U.S. at 396. Indeed, "the mere presence of contraband, without more, does not give rise to exigent circumstances." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991).

The Eleventh Circuit often recognizes sufficient exigent circumstances justifying a no-knock entry when the officers have *specific* knowledge that the suspect, or someone else inside of the home, has or is likely to have a weapon. *See, e.g., Santana*, 688 F. App'x at 768 (officer had been told that the suspect drug dealer had ready access to a gun); *Kobayashi*, 581 F.3d at 1306 (the SWAT team had knowledge that the suspect carried a concealed handgun and kept a shotgun in his bedroom). The Supreme Court has also found sufficient exigent circumstances present when the officers have reasonable suspicion of the destruction of evidence. *Richards*, 520 U.S. at 394.

Here, the record lacks any evidence that Defendants had any specific knowledge of Smith or anyone else in the home having a weapon. When Ashley Greer submitted his affidavit supporting his application for a search warrant to the magistrate judge, he

stated that since Smith's home was an "establishment for drugs and drug transactions," there may be other individuals present who have "drugs and/or weapons" in their possession. [Doc. 14-11, p. 10]. But, this recycled, cut-and-paste type language does not help the Defendants in this case because, as discussed above, the Supreme Court has rejected a blanket rule that reasonable suspicion of drugs automatically provides officers with sufficient exigent circumstances to ignore the knock and announce requirement. *See Richards*, 520 U.S. at 396. Further, any suspicion of exigent circumstances must be specific to the case, not a general suspicion based on general or stereotypical inferences. *Id*. at 394 (stating that police are justified in a no-knock entry if they have reasonable suspicion of an exigent circumstance "under the particular circumstances"). Therefore, the affidavit's boilerplate language referring to the possibility of a weapon being in the home based solely on the fact that it is an "establishment for drugs and drug transactions" is not enough. After all, Greer had over six months from the time the confidential informant first told him about Smith's marijuana-related activities to investigate the crime, and during that time, Greer gathered no information nor developed any intelligence that Smith may have had a weapon or routinely kept weapons close.

Likewise, no officer testified that he had any reason to believe those inside the house were destroying evidence. In fact, the officers never indicated that they saw or heard any movement or activity inside the house whatsoever. After all, it was 2:00 on a

Monday morning, and the record doesn't contain any evidence that the officers had any reason to believe that the person or persons inside were anything other than sound asleep.

The record also shows that the SWAT Team realized a washing machine was blocking the front door of Smith's house when they arrived. [Doc. 14-2, ¶ 17]. The officers decided to use the back door instead, which they had designated ahead of time as the alternative breach point if there was an issue with the front door. [*Id*.]. A munificent look at this fact could reveal an attempt to barricade the entrance to the house from unwanted intruders, such as law enforcement, indicating that those inside are anticipating an unwanted entry and thus prepared to either respond with force or dispose of evidence while the intruders attempt to get around the barricade. The Court, however, is not convinced that a washing machine blocking the front door to a house gives rise to an exigent circumstance warranting a no-knock entry.

Defendants point to *Bruna*, *supra*, to argue that their failure to knock and announce does not deny the officers qualified immunity. [Doc. 14-3, p. 12]. But in *Bruna*, "[i]n addition to evidence that Diotaiuto was selling illegal narcotics in his home, the investigation also revealed Diotaiuto carried a handgun on his person at all times and kept a loaded shotgun in his bedroom closet." 343 F. App'x at 506. Here, Defendants had no such knowledge of Smith having a weapon before they entered his home.

Again, the Court acknowledges that the bar to allow cops to ignore the knock-

and-announce requirement under an exigent circumstances analysis is "not high." *Richards*, 520 U.S. at 394; *Santana*, 688 F. App'x at 768. But, even low bars must be met. And the facts known to the SWAT Team officers who entered Smith's residence simply don't meet it. Since the Court must assume for purposes of this motion that the Defendants did not knock and announce before entering Smith's home and there were no exigent circumstances to allow them to do so, they violated the Fourth Amendment. *See Wilson*, 514 U.S. at 934.

>            iii.    *Clearly Established*

As discussed above, both Supreme Court and Eleventh Circuit precedent have clearly established that a no-knock entry absent exigent circumstances violates the Fourth Amendment. *Richards*, 520 U.S. at 394. It is likewise clearly established that knowledge of drugs or narcotics activity alone is not an exigent circumstance. *Id*. at 396. Therefore, viewing the disputed facts in the light most favorable to Plaintiffs as the nonmovants, the Defendants violated Plaintiffs' clearly-established constitutional right by failing to knock and announce absent a showing of exigent circumstances. Defendants' Motion for Summary Judgment as to the unlawful entry claim is therefore **DENIED**.

>        2.    <u>Excessive Force</u>

Plaintiffs argue that Defendants violated Smith's Fourth Amendment right to be free from excessive force when Defendants shot him in his home while executing a

search warrant.

Recalling the basic facts regarding the execution of the search warrant, Ford testified that he entered the house and went right. [Doc. 19, Ford Depo., p. 72:10–11]. Ford heard a shotgun blast. [*Id*. at p. 73:20–21]. Ford then peeked around a corner and saw a white male—Smith—in boxer shorts[7] holding a shotgun. [*Id*. at p. 74:1–4]. Ford told Smith to "drop it." [*Id*. at p. 74:5]. Smith didn't, so Ford took cover. [*Id*. at p. 74:6–11]. According to Ford, Smith fired a second shot. [*Id*. at p. 74:12]. At that moment, Ford came out from behind his cover and returned fire. [*Id*. at p. 74:14–16]. Smith moved out of Ford's line of sight and fired his third shot. [*Id*. at p. 74:22–25]. Ford then heard one of his teammates yell out in response to Smith's third shot. [*Id*. at p. 74:25–75:2]. Ford rounded the corner, placing Smith back in his line of sight, and fired approximately five rounds, which put Smith down. [*Id*. at p. 75:3–6].

During the gunfight, Wynn and Farmer also fired shots, and Wynn and Patterson received gunshot wounds. [Doc. 14-2, ¶¶ 28, 29, 31]. No witness who was actually in the home during the gunfight contradicts Ford's testimony that Smith fired first, and only then did the SWAT Team return fire. Ryles, who heard the gunfight from inside the bedroom, testified that she could not recognize the sound of a shotgun as distinct from the sound of a rifle or Glock and thus could not tell who fired first. [Doc. 14-4, Ryles

---

[7] Ford's testimony describes Smith as wearing "boxer shorts," but Ryles' testimony stated that Smith was wearing "sleep pants."

Depo., pp. 33:24—34:4].[8]

As discussed in the unlawful entry analysis above, the Court has determined that the officers engaged in a discretionary duty when they entered Smith's home. *See* Discussion B(1)(i), *supra*. Again, Plaintiffs must show that qualified immunity is not appropriate by demonstrating both the violation of a constitutional right and that the constitutional right was clearly established at the time of the incident. *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009).

### i.       *Constitutional Violation*

"Determining whether the force used in a particular seizure was excessive and therefore unreasonable under the Fourth Amendment requires a court to consider the 'nature and quality' of the intrusion on the individual's Fourth Amendment interests against the countervailing government interest at stake." *Cantu v. City of Dothan*, No. 18-15071, 2020 WL 5270645, at *8 (11th Cir. Sept. 3, 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Reasonableness of the force used is considered from the perspective of "a reasonable officer at the scene." *Graham*, 490 U.S. at 396. This is an objective test that does not consider an individual officer's intent or motivation. *Id*. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an

---

[8] Smith's father, Raymond Smith, testified that Smith would not have started a gunfight with known police officers. [Doc. 14-5, pp. 58:22–59:1]. Plaintiffs cite to this testimony to rebut Defendants' assertion that Smith fired first. [Doc. 15-1, ¶¶ 23, 24, 26, 28, 29]. But the elder Smith wasn't there when his son was shot; his speculative testimony simply has no legal bearing on what actually happened during the shooting.

objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id*.

The reasonableness of the force used is informed by factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. Ultimately, "reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used." *Santana*, 688 F. App'x at 770. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014).

"It is reasonable, and therefore constitutionally permissible, for an officer to use deadly force against a subject who poses an immediate threat of serious physical harm to the officer or others." *Santana*, 688 F. App'x at 770 (citing *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) ("We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril.") and *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("Although suspects have a right to be free from force that is

excessive, they are not protected against a use of force that is necessary in the situation at hand.")). "The relevant inquiry in the qualified immunity context is whether an officer in the defendant's position reasonably could have perceived the subject to pose such a threat." *Santana*, 688 F. App'x at 770 (citing *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003)). "The officer is entitled to qualified immunity unless every reasonable officer in his position inevitably would conclude that deadly force was unnecessary and thus unlawful under the circumstances." *Santana*, 688 F. App'x at 770 (quoting *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

The undisputed facts support Defendants' argument that the SWAT Team officers' use of force against Smith was reasonable. An objectively reasonable officer, upon having a shotgun fired at him or her in close quarters, would perceive the shooter to pose an imminent and serious threat to him and his fellow officers at the time of the shooting. While the officers had no specific or particular knowledge of Smith being armed or dangerous before entering Smith's home, that changed when Smith fired his shotgun. At that point, the officers were in a life-threatening situation and a reasonable officer in the Defendants' position would conclude that deadly force was necessary in that situation to preserve his or her own life. Accordingly, the Defendants did not use excessive force in this particular case and thus, did not violate the Fourth Amendment.

Plaintiffs argue that Defendants' conduct leading up to the moment when they shot Smith caused the danger that made the use of force necessary. [Doc. 15, p. 6].

Specifically, Plaintiffs argue that "to the extent Defendants claim that someone can be arrested for their response to being unlawfully arrested or assaulted, it is established law [that] Defendants cannot initiate conduct to cause or precipitate the need for an arrest, and then claim immunity from civil liability." [*Id*.]. Plaintiffs cite to *Perkins v. Thrasher*, 701 F. App'x 887, 890 (11th Cir. 2017), where officers were denied qualified immunity when they provoked the plaintiff into obstructing arrest necessitating the use of force. [*Id*.]. Plaintiffs argue that this is a similar situation, because "Rainer Smith was responding to an unlawful entry into his home by heavily armed intruders who did not announce who they were." [*Id*.].

Plaintiffs' argument reminds the Court of the old "provocation rule" that was considered by the Supreme Court of the United States in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1543-44 (2017). The "provocation rule" provided that "[i]f law enforcement officers make a seizure of a person using force that is judged to be reasonable based on a consideration of the circumstances relevant to that determination, []the officers nevertheless [may] be held liable for injuries caused by the seizure on the ground that they committed a separate Fourth Amendment violation that contributed to their need to use force." *Id*. at 1543. The Supreme Court held that "the Fourth Amendment provides no basis for such a rule." *Id*. at 1544. Accordingly, a "different Fourth Amendment violation," which here is an unlawful entry into Smith's residence as explained above, "cannot transform a later, reasonable use of force into an

unreasonable seizure." *Id.*

In sum, applying the objective reasonableness test shows that the use of deadly force on Smith was reasonable at the moment the force was used, and the officers' unlawful entry does not change that.[9]

### ii.     Clearly Established

Even assuming a constitutional violation, Defendants are entitled to qualified immunity unless Plaintiffs can show that Smith's right to not be subjected to deadly force under the particular circumstances surrounding his shooting was clearly established at the time of the incident. *See Plumhoff*, 572 U.S. at 778–79; *Santana*, 688 F. App'x at 772.

In an attempt to meet this burden, Plaintiffs cite to several authorities: (1) O.C.G.A. § 17-5-27, which authorizes officers to use force in execution of a warrant only if they announce their presence. [Doc. 15, p. 5]; (2) *John Bad Elk v. United States*, 177 U.S. 529, 537 (1900) for the proposition that one has the right to use such force as is absolutely necessary to resist an attempted illegal arrest. [*Id*. at p. 6]; (3) O.C.G.A. § 16-3-

---

[9] Plaintiffs argue in their Response to Defendants' Motion for Summary Judgment that even though only Defendants Ford, Wynn, and Farmer fired shots during the gunfight, Patterson and Lavender can nonetheless be liable for failing to stop the alleged constitutional violation. [Doc. 15, p. 9]. Even if Plaintiffs had properly raised this argument prior to their Response to the Motion for Summary Judgment, which is too late, it would fail. In *Priester v. City of Riviera Beach*, the Eleventh Circuit held that liability for failure to intervene "only arises when the officer is in a position to intervene and fails to do so." 208 F.3d 919, 924 (11th Cir. 2000). The entire gunfight happened in a matter of seconds, and none of the officers were in a position to safely or realistically prevent any of the other officers from using deadly force. Moreover, since the Court finds the Defendants' use of force to be constitutional under the particular circumstances, the Defendants who did not fire cannot be liable for failing to stop an unconstitutional use force.

23 for the proposition that one is justified in using deadly force to defend his own home. [*Id*. at p. 7]; and (4) *Perkins v. Thrasher*, 701 F. App'x 887, 890 (11th Cir. 2017) for the proposition that Defendants cannot initiate conduct to cause or precipitate the need for an arrest and then claim immunity from civil liability. [*Id*. at p. 6].

Yet, none of these authorities satisfy Plaintiffs' burden of showing a violation of a "clearly established" constitutional right. First, the citations to state statutes are not helpful in showing the violation of a clearly established federal constitutional right. Second, assuming *arguendo* that the *John Bad Elk* case informs whether Smith was justified in using deadly force, that nonetheless has no bearing on whether the SWAT Team was justified in using deadly force. Put another way, the *John Bad Elk* analysis is from the perspective of an arrestee, which is relevant at the arrestee's criminal trial if charged with a crime involving use of force against the arrestor, whereas a Fourth Amendment excessive force case like the one here looks to the "perspective of a reasonable officer at the scene." *Cantu*, 2020 WL 5270645, at *21. And finally, the *Perkins* decision is of no avail to Plaintiffs because there, the officers were not faced with a life-threatening situation, nor were they executing a search warrant. 701 F. App'x at 888–89.

Since Plaintiffs do not cite any caselaw that could have put Defendants on notice that their actions were unlawful, they have failed to meet their burden of showing the violation of a clearly established constitutional right. Accordingly, Defendants' Motion

for Summary Judgment as to Plaintiffs' excessive force claim is **GRANTED**.[10]

**C.**     <u>**State-Law Claims**</u>

1.     <u>Negligence and Wrongful Death Claims Against SWAT Team Officers</u>

The Georgia Constitution provides that state officers and employees engaged in discretionary functions "may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const., art. I, § 2, ¶ IX(d). The Supreme Court of Georgia has explained that "actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact." *Adams v. Hazelwood,* 520 S.E.2d 896, 898 (Ga. 1999). The "deliberate intention to do wrong" required to overcome official immunity is "the intent to cause the harm suffered by the plaintiffs." *Murphy v. Bajjani*, 203, 647 S.E.2d 54, 60 (Ga. 2007).

The Court has already found that the officers were engaged in a discretionary function when they executed the search warrant. *See* Discussion B(1)(i), *supra*. The sole

---

[10] Plaintiffs' unlawful entry claim survives summary judgment, and Plaintiffs' excessive force claim does not. "Although § 1983 addresses only constitutional torts, § 1983 defendants are, as in common law tort suits, responsible for the natural and foreseeable consequences of their actions." *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000). "For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Id*. So, while Defendants are not liable for the "excessive force" claim, they are liable for any and all reasonably foreseeable damages caused by their unlawful entry violation that may ultimately be proven at trial.

remaining question now becomes whether the officers acted with actual malice when they did so. After a thorough and extensive review, the Court finds nothing in the record to conclude that the Defendants acted with actual malice towards Smith. To find that the officers had "intent to cause the harm suffered by the plaintiffs" would mean that the officers went to Smith's home that night for the purpose of killing him. *Murphy*, 282 Ga. at 203. In other words, the Plaintiffs would have to prove that the Defendants murdered Smith. Nothing supports such a theory. Accordingly, the Court finds that the Plaintiffs' state law negligence and wrongful death claims against the officers in their individual capacities fail, and Defendants' Motion for Summary Judgment as to all of Plaintiffs' remaining state law claims against the officers is **GRANTED**.

### 2.   Negligence and Wrongful Death Claims Against City of Byron

Defendants argue that Plaintiffs' negligence and wrongful death claims against the City of Byron fail because Plaintiffs failed to provide proper and timely *ante litem* notice to the city pursuant to O.C.G.A. § 36-33-5. [Doc. 14-3, p. 16]. Plaintiffs do not respond to this argument.[11] [Doc. 15]. The Georgia *ante litem* notice statute provides that

> Within six months of the happening of the event upon which a claim against
> a municipal corporation is predicated, the person, firm, or corporation
> having the claim shall present the claim in writing to the governing
> authority of the municipal corporation for adjustment, stating the time,
> place, and extent of the injury, as nearly as practicable, and the negligence

---

[11] Plaintiffs' Complaint states that "[a]ny ante-litem notice requirements have been complied with." [Doc. 1-2, ¶ 11]. Yet, Plaintiffs never put any evidence in the record that this allegation is true. Plaintiff's assertion was entitled to the presumption of truth at the motion to dismiss stage, but not at the motion for summary judgment stage. "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

> which caused the injury. No action shall be entertained by the courts against the municipal corporation until the cause of action therein has first been presented to the governing authority for adjustment.

O.C.G.A. § 36-33-5(b). Failure to comply with this notice requirement is grounds for granting summary judgment as to the state law claims against the City of Byron. *See Hoskins v. City of Atlanta*, No. 1:07-cv-2347-BBM, 2009 WL 10666090, at *10 (N.D. Ga. Mar. 23, 2009). Because the record contains no facts to rebut Defendants' argument that Plaintiffs did not comply with the *ante litem* notice requirement, the Court **GRANTS** summary judgment as to the remaining negligence and wrongful death claims against the City of Byron. Thus, the Clerk shall terminate the City of Byron as a defendant.

<u>**CONCLUSION**</u>

The Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 14] as to Plaintiffs' excessive force, negligence, and wrongful death claims against all Defendants, and the Court **DENIES** Defendants' Motion as to the Plaintiffs' unlawful entry claim against the SWAT Team Defendants in their individual capacities. The Court will immediately place this case on its trial list.

**SO ORDERED**, this 22nd day of September, 2020.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**